UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | CAUSE NO. 3:21-CR-52 DRL |
| MARTIN J. DEVALOIS, | |
| Defendant. | |

OPINION & ORDER

The government charged Martin Devalois with unlawfully possessing a firearm as a felon. *See* 18 U.S.C. § 922(g)(1). On July 21, 2021, he moved to suppress evidence obtained by law enforcement the day he was arrested. He says law enforcement unreasonably prolonged his seizure under the Fourth Amendment. After briefing, the court held an evidentiary hearing on October 7, 2021. *See United States v. Coleman*, 149 F.3d 674, 677 (7th Cir. 1998). The court now denies the motion to suppress.

FACTUAL FINDINGS

These facts emerge from the evidence and testimony presented to the court.[1] *See* Fed. R. Crim. P. 12(d). On March 5, 2021, LaPorte County Sheriff's Deputy Jon Samuelson, seven years into his law enforcement career, observed a Toyota Highlander westbound on U.S. 20 following a semitruck too closely [Tr. 9-10]. Within a 45 mile per hour zone, albeit on a sunny and dry day, the Highlander traveled unsafely behind, less than a car length from the semitruck [Tr. 10-11].

After observing the Highlander persist, at 9:58 a.m. Deputy Samuelson alerted dispatch that he would be conducting a traffic stop [Tr. 12-13]. He thereafter stopped the vehicle and approached the passenger side at approximately 10:01 a.m. [Tr. 12-13, 29]. He observed Mr. Devalois in the

---

[1] The government called Deputy Jon Samuelson. The defense admitted the warning citation [Ex. 1]. The LaPorte County Sheriff's Department at the time lacked dashcams or body cameras, so no video footage of the traffic stop exists.

passenger seat and a woman in the driver's seat. He requested her license and registration; but the driver shared that she had rented the Highlander in Illinois and that she had no hard copy of the rental agreement, but that she might have a copy on her phone [Tr. 14].

Deputy Samuelson invited the driver to the squad car while she searched for the agreement [Tr. 14-15, 39]. This often is standard protocol for the officer's safety and to reduce lag time during a traffic stop should the officer need to return to the vehicle for more information [Tr. 15]. She complied and opened the squad car's passenger door and sat inside [Tr. 15-16]. Bosco—a Belgian Malinois trained in narcotics, tracking, and apprehension—sat in the back [Tr. 8-9]. The canine received annual recertification and had last been recertified in August 2020 [Tr. 9]. He barked initially [Tr. 32-33].

Once inside, Deputy Samuelson began a driver's license check using his computer and endeavored to obtain a return from the Illinois fleet plate on the Highlander [Tr. 16]. The fleet return in Illinois was (and often is) slow [*id.*]. Meanwhile, the driver tried to locate the rental agreement on her phone [Tr. 17]. She exhibited shallow breathing and trembling hands—enough that the officer thought her more anxious than usual [Tr. 18]. Though Bosco perhaps contributed to her nerves initially, she commented how cute he was [Tr. 32-33].

While awaiting the license and fleet return, Deputy Samuelson asked the driver a few questions [Tr. 18]. The deputy asked fewer than a handful of questions, not unrelated to the stop [Tr. 33-34]. She said they were coming from South Bend where they had been a day or two [Tr. 18]. She advised she couldn't locate the agreement, so Deputy Samuelson returned to the Highlander to procure the Illinois registration [*id.*].

He noticed that an eyeglass container—originally sitting above the glove compartment—had disappeared, though Mr. Devalois had no eyeglasses on when he was stopped [Tr. 18-19]. Deputy Samuelson asked for the registration card; as Mr. Devalois looked for it, he responded to a question saying they were coming from near Notre Dame [Tr. 19]. When Deputy Samuelson asked him about

2

how long they had been there, Mr. Devalois became unhappy and used profanity in refusing to answer "so many questions" for a traffic stop [*id.*].

After procuring the registration, Deputy Samuelson returned to his squad car because he then had the information to complete the warning [Tr. 19-20]. He began handwriting the warning in his warning book [Tr. 20-21]. He noticed the driver's anxiety persisted, so he first tried to calm her by saying she was receiving only a warning but then asked seven questions covering whether specific drugs, large amounts of currency, or firearms were in the vehicle [Tr. 21]. The driver said no [*id.*].

As Deputy Samuelson worked on the warning ticket, he asked the driver for consent to search her vehicle, and she again said no [*id.*]. At 10:05 a.m., four minutes after Deputy Samuelson made contact with the driver, Deputy Cory Chavez arrived to assist [Tr. 22]. Deputy Samuelson handed Deputy Chavez the warning to complete while he retrieved Bosco to conduct a free air sniff of the Highlander [Tr. 22, 40]. He decided to forego the Illinois fleet return that would report whether the vehicle was stolen so as not to hold up the traffic stop [Tr. 46].

Mr. Devalois was irate and demanded to know why a dog was coming to the vehicle [Tr. 23]. Bosco alerted to the presence of narcotics, and Deputy Samuelson notified dispatch promptly at 10:07 a.m. [*id.*]. Deputy Chavez was still working on the warning citation [Tr. 25].

After securing Bosco, Deputy Samuelson asked Mr. Devalois to exit [Tr. 24]. He refused. Deputy Samuelson called for Deputy Chavez. Both deputies approached the Highlander. Mr. Devalois slid to the driver's seat. The deputies pulled their sidearms. Mr. Devalois fled in the vehicle before they could subdue him [Tr. 24-25]. A hot pursuit ensued during which Deputy Samuelson notified dispatch at 10:09 a.m. [Tr. 25]. Thirty minutes later Mr. Devalois was arrested [Tr. 27].

Law enforcement discovered a Ruger handgun in the center console, a magazine in the trunk, and marijuana shake within the vehicle [Tr. 28]. Officers reported that items had been thrown from the Highlander during the pursuit, but no additional evidence was located [*id.*]. Deputy Samuelson

3

completed the warning ticket for the driver at 11:19 a.m. [Ex. 1; Tr. 48]. Mr. Devalois was charged with unlawfully possessing a firearm as a felon.

## DISCUSSION

The Fourth Amendment to the United States Constitution establishes the people's right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *Caniglia v. Strom*, 141 S. Ct. 1596, 1599 (2021). As the constitutional text declares, the "touchstone of the Fourth Amendment is reasonableness." *United States v. Knights*, 534 U.S. 112, 118 (2001). It protects a person in his home and on the street, in his room and in his car. *Lange v. California*, 141 S. Ct. 2011, 2018 (2021); *Katz v. United States*, 389 U.S. 347, 351 (1967); *see also Terry v. Ohio*, 392 U.S. 1, 8-9 (1968).

An automobile stop by law enforcement, even if brief, constitutes a person's seizure within the Fourth Amendment's meaning. *Whren v. United States*, 517 U.S. 806, 809-10 (1996); *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975). "Ever mindful of the Fourth Amendment and its history," the court views "with disfavor practices that permit police officers unbridled discretion to rummage at will among a person's private effects." *Byrd v. United States*, 138 S. Ct. 1518, 1526 (2018) (quotation omitted). Thus, an automobile stop initiated by law enforcement must be reasonable. *Whren*, 517 U.S. at 810. Evidence obtained from an unreasonable search or seizure must be suppressed. *Wong Sun v. United States*, 371 U.S. 471, 484 (1963).

Mr. Devalois accepts law enforcement's cause to conduct a traffic stop and later to search the vehicle once the canine alerted and he fled, but he says the deputies unreasonably prolonged the traffic stop beyond what was needed to complete a warning citation. The government bears the burden of proving by a preponderance of the evidence that the stop complied with the Fourth Amendment. *See United States v. Peters*, 743 F.3d 1113, 1116 (7th Cir. 2014); *United States v. Garcia-Garcia*, 633 F.3d 608, 612 (7th Cir. 2011). The government met its burden.

A stop that started lawfully nonetheless can violate the Fourth Amendment if its manner of execution unreasonably infringes on liberties protected by the Constitution. *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). For example, "[q]uestioning that prolongs the detention, yet cannot be justified by the purpose of such an investigatory stop, is unreasonable under the [F]ourth [A]mendment." *United States v. Childs*, 277 F.3d 947, 952 (7th Cir. 2002) (*en banc*). A seizure justified "solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably necessary to complete that mission." *Caballes*, 543 U.S. at 407.

The permissible duration of a traffic stop is "determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (internal citation omitted). "Unrelated inquiries may not measurably prolong a traffic stop, although an officer may conduct ordinary inquiries incident to the stop such as questions involving the driver's license, the vehicle's registration, and whether there are outstanding warrants for the driver." *United States v. Stewart*, 902 F.3d 664, 672 (7th Cir. 2018). Even then, an "officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009) (citation omitted); *accord United States v. Muriel*, 418 F.3d 720, 726 (7th Cir. 2005) (officer may ask a "moderate number of questions," even "questions that do not concern the purpose of the stop and that are not supported by any other suspicion").

The key question here is whether the canine search, at most seven minutes into the traffic stop, unreasonably prolonged it beyond the time it would have taken for Deputy Samuelson to complete his mission of issuing a warning to the driver. *See United States v. Lopez*, 907 F.3d 472, 486 (7th Cir. 2018) ("The question does not depend on exactly how many minutes the stop lasts. It depends on whether law enforcement has detained the person longer than needed to carry out the

investigation that was justified by the reasonable suspicion."); *see, e.g., United States v. Offord*, 788 Fed. Appx. 384, 387 (7th Cir. 2019) (time from the initial stop to the dog alert was not unreasonably prolonged when the trooper was processing the passenger's outstanding arrest warrant and briefing another officer who arrived on the scene); *United States v. Sanford*, 806 F.3d 954, 956-57 (7th Cir. 2015) (total time of 26-27 minutes from the initial stop of the vehicle to the dog alert was reasonable when the trooper was checking the occupants' criminal histories on the computer in his car and obtaining additional suspicious information from the driver). "Authority for the seizure [] ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez*, 575 U.S. at 354.

The answer to this question doesn't hinge on "whether the dog sniff occurs before or after the officer issues a ticket" but whether the dog sniff "prolongs" the stop. *Id.* at 357. The answer today is undoubtedly no. Deputy Samuelson, a credibly precise witness, testified that much of any time eaten up in the (at most) nine-minute encounter—and only six minutes from engagement with the driver to the canine's alert—was attending to safety concerns, waiting for the driver to find the rental agreement, awaiting license or Illinois fleet plate return, going back and forth from the vehicles initially and later for the registration, and then completing the warning ticket. The deputy even worked around the delay occasioned by the Illinois fleet return rather than hold up the stop. That displayed diligence, not delay.

Deputy Samuelson's moderate questions didn't prolong the stop. *See Muriel*, 418 F.3d at 726. The handoff to Deputy Chavez also wasn't a delay. Officers justifiably confer for safety reasons, and this update officer-to-officer was momentary. Deputy Samuelson completed the dog sniff before the warning was completed or should have been completed. To be sure, it was a short document to complete [Ex. 1], but Deputy Samuelson had just begun to fill it in when he handed off that task to his colleague as he conducted the dog sniff. The dog sniff didn't prolong the stop. Without any unreasonable delay from the officers, the dog sniff was constitutional. *See United States v. Lewis*, 920 F.3d 483, 491-92 (7th Cir. 2019). "It is well-established a dog sniff of a vehicle's exterior only for illegal

6

drugs *during* a lawful stop for a traffic violation does not infringe Fourth Amendment rights, even absent reasonable suspicion of drugs." *Id.* at 491. In any event, Mr. Devalois' attenuated seizure after his flight of thirty-minutes gave law enforcement probable cause to search the vehicle. *See California v. Hodari D.*, 499 U.S. 621, 629 (1991).

## CONCLUSION

The Fourth Amendment prohibits unreasonable searches and seizures, not good police work conducted within constitutional parameters for a traffic stop and later aided by probable cause. The court DENIES the motion to suppress [ECF 16].

SO ORDERED.

October 8, 2021                                              *s/ Damon R. Leichty*
                                                             Judge, United States District Court